**Kevin and Diana PEKAREK,**
**Plaintiffs,**

v.

**SUNBEAM PRODUCTS,**
**INC., Defendant.**

**No. 06–1026–WEB.**

United States District Court,
D. Kansas.

Sept. 30, 2008.

Named Expert: William T. Cronenwett, Chris Komarek

George E. McLaughlin, McDermott, Hansen & McLaughlin, LLP, Denver, CO, Todd B. Butler, Butler & Associates, P.A., Topeka, KS, for Plaintiffs.

Amy M. Decker, Scott R. Schillings, Hinkle Elkouri Law Firm LLC, Wichita, KS, George J. David, Stephen T. Moffett, Thomas L. Vitu, Moffett & Dillon PC, Birmingham, MI, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiffs Kevin and Diana Pekarek brought this action in the District Court of Barton County, Kansas, alleging that an electric blanket manufactured by defendant Sunbeam caught fire and caused extensive damage to their house. The case was removed to federal court and is now before the court on several motions by the defendant. Jurisdiction in this court is proper under 28 U.S.C. § 1332(a), as the dispute is between citizens of different states and the amount in controversy exceeds $75,000.

The following motions are before the court: Motion in Limine to Exclude Testimony of Plaintiff's Expert William T. Cronenwett (Doc. 82); Motion in Limine to Exclude Testimony of Chris Komarek (Doc. 84); Motion in Limine to Exclude Testimony of Reid Kress, Ph.D. (Doc. 88); and Motion for Summary Judgment (Doc. 86).

### I. Background.

In December of 2003, Diana and Kevin Pekarek purchased a Sunbeam electric blanket as a Christmas present for Kevin's then–21–year–old son Adam. The blanket was used by Adam on his metal futon bed at plaintiffs' residence at 401 South Kennedy Street, Ellinwood, Kansas. The blanket was designed, manufactured and distributed by defendant Sunbeam.

Adam testified he came to live with his father and step-mother a couple of months before the fire, after getting out of Larned State Hospital. He had been hospitalized because he couldn't get off drugs and had tried to commit suicide.

Adam testified that he left the electric blanket on nearly all the time, only turning it off once or twice in the time he had it. He ordinarily did not make his bed, and the Sunbeam blanket was usually left in a bunch on the futon bed or partially on the floor, under another blanket or with some clothes. Other electrical items, including a television and a computer, were also located in Adam's bedroom. Adam also testified that he smokes cigarettes, although he said he did not smoke in the house.

Adam testified that on the day of the fire, January 25, 2004, he had gone out driving around for a while. When he got back, he attempted to light a candle in his bedroom, using a large "fireplace match." Adam testified he was unable to light the candle because the wick was pushed down into the wax, and he burnt his fingers on the match. He testified that he blew out the match and discarded it in a trash can in the kitchen before starting to wash the dishes. About twenty minutes later, Adam smelled smoke and looked around but did not see smoke. He subsequently saw smoke rolling from his bedroom. He yelled to Jason Bryant, Diana Pekarek's son who was watching TV in the living room, to call 911. Adam looked in the bedroom and saw flames on the bed. The fire in the bedroom caused substantial damage to plaintiff's property.

Subsequent to the fire, investigators found the match stick that Adam had thrown away in the kitchen trash can. The match head was missing. The fire did not start in the kitchen trash can.

The blanket in question contained a "positive temperature coefficient" or "PTC" heating element. Since May of 2001, all Sunbeam products of this sort, including this blanket, were made with a safety circuit known as Circuit 104.

Plaintiffs contend the fire was the result of a defect in the design and/or manufacture of the electric blanket. They claim Sunbeam was on notice of a large number of fires occurring in its products with the same PTC element, and was aware that Circuit 104 was not 100% effective in preventing fires caused by known failures of the PTC element. Plaintiffs deny they misused or abused the product and deny that any such misuse was a cause of the fire. Plaintiffs contend the defendant is strictly liable for the damages suffered, pursuant to § 402A of the Restatement (Second) Torts, for putting a defective and

unreasonably dangerous product in the marketplace. They allege the defendant was negligent in the design, manufacture, warnings, labeling, and failing to recall the product or otherwise warn of defects. They allege the defendant violated the Kansas Consumer Protection Act by making misrepresentations to consumers regarding the safety of the blanket. Plaintiffs claim Sunbeam breached express and implied warranties as to the merchantability and fitness for intended use of the blanket. Plaintiffs seek compensatory, civil, and punitive damages, as well as attorney's fees and costs.

The defendant denies that the blanket was defective in its design or manufacture. It contends the blanket was not the cause of the fire, and that the close proximity in time between the lighting of matches in the bedroom and the fire makes the careless use of matches the most probable cause of the fire.

## II. Defendant's Motion to Exclude Testimony of William Cronenwett.

Defendant moves to exclude the testimony and opinions of William T. Cronenwett, Ph.D., an expert in electrical engineering retained by the plaintiffs. Dr. Cronenwett produced a report (Doc. 83, Exh. A) and gave deposition testimony in this case. Defendant argues that Cronenwett's opinions lack scientific support or reliability and are not based upon the facts of the case.

*A. Summary of Report.* Dr. Cronenwett's report begins with a statement of what he considers the relevant facts of the ignition of the Pekarek fire, including an observation that Reid Kress, Ph.D., P.E., another of plaintiffs' experts, "is of the opinion that the fire originated in the electric blanket, to the exclusion of other ignition sources." *Id.,* ¶ 3. Dr. Cronenwett's

subsequent opinions are thus premised in part on an assumption that the blanket was in fact the source of this fire, although this assumption is not made clear in some portions of his report.[1] Dr. Cronenwett made the point more clearly in his deposition when he was asked whether he would be offering testimony as to the origin or cause of the fire:

A. I'm not going to be offering anything on the—I'm not going to be offering any information on the origin of the fire. I will be explaining that if indeed the blanket is singled out as the cause of the fire, there are a number of mechanisms which can start it.

Q. All right. You were not—didn't do an analysis in that you could eliminate other potential causes of the Pekarek fire?

A. No, I did not.

Q. All right. So as far as you know, in this case anyways, the Pekarek fire could have been caused by a source other than the electric blanket?

A. It's possible. I don't have any information to the contrary.

Doc. 83, Exh. 3, Depo. P. 10.

After summarizing the physical evidence, Dr. Cronenwett's report identifies a number of possible ignition sources, or "fire causing failure modes," for a blanket of this type. Based upon evidence and information he examined, including the remains of the Pekarek blanket, he ruled out the following possible sources in this instance: the electric blanket line cord and power plug; the surviving 80 inches of blanket connecting cord and the missing 40 inches of blanket cord; and the blanket control. Doc. 83, Exh. A, 15. Dr. Cronenwett identified three remaining putative

ignition sources within the blanket: the blanket connector assembly, the PTC cable in the blanket, and a functional failure of the control safety circuit. *Id.,* ¶ 16.

Dr. Cronenwett states that the control safety circuit would not itself be a direct source of fire, but its failure to operate effectively would fail to prevent ignition elsewhere in the blanket from "known failure modes" of the PTC heating element. ¶ 17. He states that "recognized PTC electric blanket ignition sources" are short circuits that do not activate the control safety circuit due to a manufacturing or design defect in the safety circuit, and local overheating of the PTC cable. He states that while the specific defects causing ignition "often cannot be identified due to destruction in the fire, it is likely that one or more of the known defects did occur here" and caused the ignition of this electric blanket:

- one strand of the PTC bifilar-wound alloys broke, the safety circuit failed to operate, and the PTC cable ignited;

- as seen in other cases [citing two other cases], burning of the blanket fabric was caused by extreme overheating of short regions of the PTC cable in which exists neither short circuits nor broken conductors. In these cases an irregularity in the polyethylene web or in the contact between the web and the alloy conductors caused the extreme overheating and resulting fire.

- manufacturing damage to one of the PTC twisted pairs of conductors, which made it prone to break during normal and expected use. The break subsequently occurred, but the safety circuit failed to operate to de-energize the blan-

---

1. *See e.g. Cronenwett Report at p. 6:* "To a reasonable degree of engineering probability, the ignition of this electric blanket was caused by one or more manufacturing defects as well as a design defect...." * * * "By elimina-

tion, there remain only five ways in which the fire in this electric blanket could have started, and in fact did start: ..." * * * "One of these five scenarios definitely caused the fire in this electric blanket; ..."

ket. Arcing occurred at the point of the break and ignited the PTC cable.

- the control safety circuit failed to function in response to a fire-starting malfunction in the blanket due to one of the following defects: (1) the detection threshold was inappropriate to detect the malfunction; (2) the control safety electronics failed to operate; (3) the PTC cable produced approximately normal heat but a limited portion of its length dissipated unusually intense heat. *Id.,* ¶ 18.

Cronenwett states that the Control 104 safety circuit operates by measuring and comparing the voltage at the distant end of the PTC cable with a pre-determined threshold value. "Even if the circuit is operating properly, the circuit will not detect or respond to any fire-starting malfunction that does not cause the measured voltage to cross the threshold value." He states that this "arbitrarily selected threshold" is designed to protect against a fully open circuited and separated wire and against fully short-circuited, touching wires, but between "these two extremes the circuit will allow malfunctions that produce a range of high resistance open circuits and low resistance short circuits."

Dr. Cronenwett also states he has seen "thousands of charred and burned blanket terminal printed circuit boards in Sunbeam products" which were caused by faulty solder joints. He says that "[w]hile no physical evidence has been seen that definitely proves the blanket terminal ignition source in the Pekarek blanket, a blanket terminal malfunction remains a recognized fire source." *Id.,* ¶ 20.

Dr. Cronenwett states that of all the defects he identified, "the failure of the control safety circuit to detect and respond to the malfunction in the PTC cable conductor in the Pekarek blanket, and the resulting arcing or overheating caused by that malfunction, is the most probable

cause of the ignition of this electric blanket." *Id.,* ¶ 21. He states that by process of elimination, "there remain only five ways in which the fire in this electric blanket could have started, and in fact did start." The first three possibilities are that the PTC cable could have shorted, a single strand of the two-strand alloy conductor could have broken, or a small length of the PTC cable could have overheated with neither a short circuit nor broken wires, all in a manner that "would not trigger the safety the safety circuit because of a design deficiency discussed in this report." Fourth, a break could have occurred in one of the conductors in the PTC cable, which the safety circuit did not properly respond to. Fifth, after one of the previous malfunctions, the control safety circuit should have detected the malfunction but failed to operate and prevent fire as a result of an electronic failure. "One of these five scenarios definitely caused the fire in this electric blanket; [but] since the electric blanket remains were burned and the control safety circuit overheated, no one of these five can be stated as the one specific cause, to the exclusion of the other four." *Id.,* ¶ 23.

Another section of Dr. Cronenwett's report discusses his prior research and review of various sources, including prior electric blanket claims, Sunbeam documents, and testimony of Sunbeam engineers. He cites specific examples of alleged defects which have caused blankets to burn or smolder in the past. Cronenwett then lists a number of exhibits and demonstrative aids he would use at trial, including videotaped demonstrations. Finally, the report contains a list of 16 conclusions and opinions. Among them are assertions that Dr. Cronenwett has observed thousands of blanket terminal circuit boards that have failed and charred or burned at defective solder joints; that he has observed blankets which prove the

PTC wire can overheat in a localized spot to the point of igniting bedding material, without breaking or arcing of the alloy conductors; that blanket assembly and design defects have been a continuing problem and that many bedding products returned for warranty claims had caught fire or burned; that Sunbeam has known that various stresses on PTC wires, connections or blanket plug-terminal junctions can cause fires; that Sunbeam has known since the 1980's that its triode-based safety circuit (such as the Circuit 100) was unreliable and ineffective in preventing fires, and has known "since 2000 that the Circuit 104 control safety circuit also allowed blankets to ignite"; that while Sunbeam claims the Circuit 104 design has significantly reduced the number of fire claims and protects against most of the described defects, "the Circuit 104 design does not protect against all fire-causing malfunctions"; that if the Pekarek blanket caused the fire at that residence, then one of the five identified failures occurred; that each of these five failures are caused by design defects; that Sunbeam's manufacturing processes were not sufficiently reliable to prevent manufacturing defects with the potential to cause fires; that due to these defects, Sunbeam PTC electric blankets with Circuit 100 and Circuit 104 safety circuits are unreasonably dangerous; and that all Sunbeam PTC products with either the Circuit 100 or Circuit 104 safety circuit "are substantially similar in their electrical design, electrical function and fire causing modes" and "are substantially similar to the Pekarek electric blanket in issue here."

*B. Summary of Defendant's Argument.* Defendant argues that Dr. Cronenwett's opinions do not meet the requirements of *Daubert.* It argues his opinions are based upon sheer speculation and are not reliable. Defendant notes that Dr. Cronenwett is not a fire origin and cause expert, and his opinions are based upon an assumption that the blanket started the fire. It notes that Cronenwett relied upon Dr. Kress' opinion about the cause of the fire, but defendant argues that Kress is not an origin and cause expert. [And in fact, plaintiffs have now withdrawn their designation of Kress as an expert on that subject]. Defendant also points out that Cronenwett failed to mention Chris Komarek, plaintiff's proposed cause and origin expert, who testified he could not rule out the attempt to light a candle as a possible cause of the fire. Thus, defendant argues, Cronenwett's "primary assumption" does not exist, and his opinions "cannot be deemed to be the product of the applicable of reliable principles and methods."

Defendant points out that many if not most of Dr. Cronenwett's opinions pertain to blankets with the Circuit 100 safety circuit, rather than the Circuit 104 present in the Pekarek blanket. It argues this reliance renders his opinions unreliable and irrelevant since his opinions are not tied to the specific facts of the case. As for the five possible ignition scenarios identified by Dr. Cronenwett, defendant complains that Cronenwett is unable to say which of the five was the cause of the fire and does not have evidence to show that any of them actually occurred. Moreover, it says, he fails to address whether the Circuit 104 would have detected these defects. Defendant thus argues the opinions are speculative and lacking any foundation.

Sunbeam argues Cronenwett also ignored important evidence in forming his opinions, including that the Pekarek blanket was used on a metal bed, and the fact that Adam Pekarek attempted to light a candle in the room shortly before the fire and the match head could not be located afterwards. In sum, defendant argues that "Cronenwett's testing, testimony, and opinions are unrelated to the facts of this case," do not reflect application of reliable

principles and methods, and are unreliable and will not be helpful to the jury.

### C. Discussion.

Rule 702 of the Federal Rules of Evidence provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, and "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R.Evid. 702.

This rule reflects the "gatekeeping" role described by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Under that role, the court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir.2003). The *Daubert* Court outlined four factors relevant to this inquiry: (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has general acceptance. *Daubert*, 509 U.S. at 593–594, 113 S.Ct. 2786. These factors, however, do not constitute a definitive checklist or test. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

As the Tenth Circuit has noted, neither Rule 702 nor *Daubert* require a finding that an expert's proffered testimony reach absolute certainty with regard to the likely truth of a conclusion. *Newman v. State Farm Fire & Cas. Co.*, 290 Fed.Appx. 106 (10th Cir.2008) (*citing Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1236 n. 2 (10th Cir. 2004)). Rather, the proponent must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements. *Newman*, 290 Fed.Appx. at 114 (*citing Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir.2003)). The focus should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions. *Bitler*, 400 F.3d at 1233.

■ Whether an expert's knowledge will "assist the trier of fact" is primarily a question of relevance. *S.V. v. Midwest Coast Transport, Inc.*, 2004 WL 3486464 (D.Kan., Jan. 2, 2004) (*citing Daubert*, 509 U.S. at 591, 113 S.Ct. 2786). An expert's knowledge may be of assistance where properly applied, but if forced into service were it does not "fit," it may not be helpful at all. *Id.*

■ Defendant does not challenge Dr. Cronenwett's educational background or his competence to express opinions generally on matters of electrical engineering. Doc. 83 at p. 2. The court notes that Dr. Cronenwett possesses a Ph.D. in electrical engineering and has an extensive track record working, teaching, and consulting in the field. He has testified as an expert in prior cases involving Sunbeam blankets. *See e.g. Hildebrand v. Sunbeam Products, Inc.*, 396 F.Supp.2d 1251 (D.Kan.2005). In fact, he estimated that half his income in recent years came from working on Sunbeam cases. There is no question but that he is qualified by education, training and experience to express opinions requiring the application of principles of electrical engineering generally to products such as

the one at issue. Moreover, there can be no question that he made a rather extensive investigation of Sunbeam blankets and is competent to describe the electrical processes at work in such products, including the blanket purchased by the plaintiffs.

Defendant's first criticism of Dr. Cronenwett's methodology concerns the fact that he assumed the Pekarek blanket, and not some other source, started the fire. Based on that assumption, Cronenwett's opinions seek to explain the mechanisms by which the blanket could have started the fire. The court concludes that this underlying assumption does not render the witness's resulting opinions unreliable or inadmissible. "The language 'facts or data' [in Rule 702] is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." *Advisory Committee Notes on 2000 Amendment to* Fed.R.Evid. 702. Obviously, Dr. Cronenwett's opinions would be inadmissible absent other evidence that could establish the existence of the underlying assumption—i.e., that the blanket started the fire. But for reasons discussed *infra,* the court finds there is sufficient circumstantial evidence from which a jury could conclude that the fire was started by the blanket rather than by a match or some other source. Unlike some other cases, there is circumstantial evidence here pointing to the blanket as the cause of the fire and tending to exclude other possible causes. Under the circumstances, the assumption made by Dr. Cronenwett has evidentiary support in the record. *Cf. Bryte v. American Household, Inc.,* 429 F.3d 469 (4th Cir.2005) (Dr. Cronenwett's testimony inadmissible where plaintiff had no other evidence of causation); *Cook v.*

*Sunbeam Products, Inc.,* 365 F.Supp.2d 1189 (N.D.Ala.2005) (opinion excluded where three investigations concluded that cigarette smoking caused the fire and there was no substantial evidence that the blanket caused it). The court further finds that his testimony will assist the jury in understanding the evidence and in assessing the issues in the case, because the electrical processes of the blanket are beyond the knowledge of most laymen and because plaintiffs must prove the plausibility of their claim that a defect in the blanket started the fire as part of their burden of proof. As long as Dr. Cronenwett's testimony makes clear that his opinions are based upon such an assumption, and his opinions do not venture beyond the limitations of that assumption, the fact that his opinions assume such a factual predicate does not render them unreliable.[2] Of course, defendant may make the assumption and the limited nature of Dr. Cronenwett's opinions clear to the jury through cross-examination. *See* Fed.R.Evid. 705.

Nor can the court say the method used by Dr. Cronenwett in reaching his conclusions otherwise renders his opinions unreliable. The materials submitted with the motion indicate that Dr. Cronenwett previously conducted an extensive study of Sunbeam blankets. The sources he reviewed include files from previous blanket failures; Sunbeam's files containing photographic evidence of alleged failures of bedding products; the available remains of the Pekarek blanket and fire; the Barton County Sheriff's incident report; Sunbeam's files on products returned for warranty claims; depositions of Sunbeam engineers; Sunbeam design drawings and

---

**2.** The court will grant defendant's motion in limine with respect to those portions of Dr. Cronenwett's report that appear to state a conclusion as to the cause of the fire without making clear his underlying factual assumption that the blanket, and not some other

source, started the fire. *See footnote 1, supra.* Assertions by Dr. Cronenwett such as the blanket "in fact did start" this fire would be misleading to the jury and will not be admissible. *See* Fed.R.Evid. 403.

patents for various safety circuits; depositions of Underwriters Laboratory engineers and videotape of UL testing; and investigative reports by DPI and Richard Prins. Dr. Cronenwett's opinions appear to be limited and informed by his physical examination of the Pekarek blanket, by his knowledge of the particular structure and electrical circuitry of this type of blanket, and by application of established principles of electrical engineering to the known facts. *Cf. McCoy v. Whirlpool Corp.,* 287 Fed.Appx. 669, 675 (10th Cir.2008) ("there is no question that Mr. Martin, in relying on electrical circuitry information, test results and other materials provided by Whirlpool, as well as his inspection of the McCoy and other Whirlpool dishwashers, based his conclusions on facts satisfying Rule 702's reliability requirements."). His opinions appear to be based in large part upon prior instances of failures in Sunbeam blankets, including those identified by Sunbeam engineers, and he has applied principles of electrical engineering to either eliminate or identify particular failures that could have started the fire in the instant case. Defendant has cited nothing to establish that Cronenwett's method in this regard is unreliable or scientifically invalid. *Cf. Farmland Mut. Ins. Co. v. AGCO Corp.,* 531 F.Supp.2d 1301, 1305 (D.Kan.2008) ("Mr. Martin's opinion did not involve application of a controversial scientific process, such that the *Daubert* factors might be more useful in determining reliability. Mr. Martin based his opinion on his experience and expertise as an electrical engineer, his investigation and inspection of the equipment, the available data from that day, the design of the system, and the opinions of other experts. This 'method' by which Mr. Martin formed this opinion is sufficiently reliable for purposes of Rule 702.").

Defendant takes issue with Dr. Cronenwett's discussion of blankets with the Circuit 100 safety circuit. It argues that such discussion is irrelevant, because the Pekarek blanket had a Circuit 104, and when "considering the product as a whole system" the two are not substantially similar. The court is not persuaded. Dr. Cronenwett's reliance upon incidents involving different safety circuits may nevertheless be relevant because all of the products involved apparently had a substantially similar PTC heating element. The characteristics of the PTC element, as shown by its prior failures, is thus tied factually to Dr. Cronenwett's opinions about whether and how a failure of that element may have contributed to starting this particular fire. Assuming Dr. Cronenwett takes into account the Circuit 104's interaction with and effect upon the PTC element, as his report and deposition testimony indicate, the fact that he cites and relies upon incidents involving the Circuit 100 does not mean he has failed to tie his opinions to the facts of the case or that such incidents are too dissimilar to be relevant. Moreover, a jury's understanding of Dr. Cronenwett's opinion about how the Circuit 104 can detect fully open circuits and some short-circuits but may nevertheless fail to detect localized overheating of the PTC wire, will likely require that he explain and contrast how this safety circuit operates differently than others, including the Circuit 100. The court does share defendant's concern that so much of Dr. Cronenwett's report focuses on products with the Circuit 100 rather than the 104. As Dr. Cronenwett previously conceded in another case, the Circuit 104 is able to detect and protect against several failures that the Circuit 100 could not. Although this does not render Dr. Cronenwett's opinions inadmissible, the court will take steps at trial— such as by specially instructing the jury— to ensure there is no danger of prejudice or confusion from discussion of blankets with the Circuit 100 safety circuit.

Sunbeam challenges other aspects of Dr. Cronenwett's method as well. Cronenwett said he tested the ability of the Circuit 104 to detect localized overheating in the PTC wire by applying an external heat source. He said he was able to heat up a portion of the PTC wire to the point of combustion without the Circuit 104 shutting off power. According to Cronenwett, this test demonstrated that if a localized overheat of the PTC wire were to occur, it might not be detected by the Circuit 104 and could result in a fire. Defendant accurately points out that Cronenwett failed to record any portion of his testing, but this does not render his testimony inadmissible. The better practice obviously would have been to document the test, but the relative simplicity of the test means it could easily be re-created if one were so inclined. And although defendant complains the test is meaningless because it was "designed to intentionally damage the product in order to cause a malfunction," it was clearly designed to simulate a known malfunction of the PTC element in order to test the safety circuit's ability to detect the malfunction. There is a logical connection between the test and Cronenwett's opinion on the safety circuit. And the court notes that Cronenwett testified the Sunbeam warranty claims he reviewed included one or more Circuit 104 blankets where local overheated areas of the PTC cable had caused a fire. Defendant has not shown "an analytical gap between the data and the opinion offered" as to such an opinion.[3] In sum, the court finds Dr. Cronenwett's testimony in this regard is sufficiently reliable and relevant to be admissible.

Defendant also objects because the witness could not say with a reasonable degree of engineering certainty which of five defects led to the fire in the Pekarek blanket. This argument fails to take account of the fact that Cronenwett said he could not be more definite about which defect occurred because the "the electric blanket remains were burned and the control safety circuit overheated. . . ." In the case of a fire, direct proof of a defect may be unavailable, but that does not preclude the drawing of an appropriate inference. Were the rule otherwise, it "would effectively establish a conclusory presumption of non-liability in favor of strict product liability defendants whose products self-destruct in the process of causing injury to persons or property." *Weir v. Federal Insurance Co.*, 811 F.2d 1387, 1392 (10th Cir.1987). In this instance, the court concludes Cronenwett's opinions are based upon reasonable inferences from the available evidence and do not amount to speculation. Dr. Cronenwett's opinions are sufficiently detailed in view of the available evidence. *Cf. Westfield Ins. Co. v. J.C. Penney Corp., Inc.*, 466 F.Supp.2d 1086, 1095 (W.D.Wis.2006) ("The fact that [the electrical engineer] cannot identify the particular defect does not make his testimony irrelevant."). Finally, defendant argues Cronenwett's opinions are unreliable "because he ignored important evidence in forming his opinions," such as Adam Pekarek's attempts to light a candle and the fact that the blanket was used on a mechanical metal bed. But as note above, Cronenwett is not a "cause and origin" expert, and his failure to examine and rule out other potential causes of the fire does not render inadmissible his opinions about how the electrical processes of the blanket

---

**3.** The court notes that the rebuttal report of Sunbeam's safety engineer, Richard Prins, asserts that the overheating of a small portion of the PTC cable is improbable because "this scenario would take a long time to ignite a fire and Adam Pekarek would have smelled the overheating/charring of materials when he was in the room." Such an assertion is an appropriate argument for a jury, but does not demonstrate that Dr. Cronenwett's opinion is scientifically invalid or unreliable.

could have started the fire. *Cf. Hildebrand v. Sunbeam Products, Inc.,* 396 F.Supp.2d 1251 (D.Kan.2005) (Dr. Cronenwett is not qualified to testify as to cause and origin, but he "may testify as to the probability of electrical fires based on his experience as an electrical engineer, the testing he conducted, and his observations of the subject blanket."). Plaintiffs may be able to satisfy their burden of showing that the blanket was the likely cause of the fire through evidence other than Dr. Cronenwett's testimony.

In sum, with the exception previously noted (see footnote 1), the court finds that Dr. Cronenwett's testimony may assist the jury in understanding the evidence and in determining the issues; that he is qualified as an expert in electrical engineering by education, training and experience; and that his opinions are based upon sufficient facts and data, are the product of reliable principles and methods, and he has applied those principles and methods reliably to the facts of the case. Accordingly, the defendant's motion is limine to exclude his testimony is denied.

### III. Defendant's Motion to Exclude Expert Testimony of Chris Komarek.

Defendant next moves to exclude expert testimony of Chris Komarek, the Chief of the City of Ellinwood Fire Department. Komarek responded to the fire and was the officer in command of the fire suppression efforts. As part of his official duties he investigated the cause of the fire and prepared a report after the incident. Komarek has been designated by plaintiffs as an expert witness in fire investigation.

A. *Summary of Report.* After completing an investigation on the Pekarek fire, Chief Komarek prepared an incident report on an official "NFIRS" [National Fire Incident Reporting System] form. Doc. 85, Exh. C. He signed the form on February 3, 2004. In a pre-printed section of the form asking for information on "Ignition," Chief Komarek indicated the fire originated with a "heat source." He listed "Bedding; blanket" as the first items ignited, and checked "Failure of equipment or heat source" as the cause of ignition. He identified the Sunbeam electric blanket in a section seeking identification of "Equipment Involved In Ignition." In a narrative section of the report, Chief Komarek described the response and suppression efforts, as well as Adam Pekarek's actions (as related by Adam to officers). He then stated the following:

> Our investigation determined the fire to have started in the NE corner of the bedroom. The scorching on the ceiling was severe in this area. Located in this corner was the bed with the head against the north wall. The fire appeared to have started down low in the NE corner. This was confirmed by the burn pattern on the bed frame and the amount of charring on the floor. There was a breaker panel located in the east wall near the corner but the fire appeared to have started well below that location and upon inspection on the panel and the interior of the wall above and below the panel we were able to rule out the electrical panel. Also it should be noted that there was no metal front on the breaker panel, only a cabinet type of door made of wood. There were two breakers in the trip position and can be noted in the photographs taken of the fire scene. We believe the fire was started by the malfunction of an electric blanket. Adam, who sleeps in the bed does not make his bed and just throws the blankets off the bed in the mornings usually going against the wall. Diane Pekarek (owner/occupant) stated that the blanket was new just being purchased this past Christmas. We were able to savage [sic] the blanket control-

ler due to the fact it was protected from the fire by blankets and clothing. It was determined to be plugged in the electric receptacle and in the on position with the setting at medium. This controller was taken from the scene by me and kept at the station. On Friday the insurance company came to the scene and wanted the controller to be sent in for evaluation. I gave the controller to them. Upon checking out the placement of the candle we did determine the candle itself was in no way near the point of origin. The candle was on the desk located on the opposite side of the room. He stated he did not get the candle lit and we were unable to determine if it had been or not. Due to the time frames surrounding this fire and the attempted lighting of the candle the possibility that in some fashion this fire was caused by the attempt made to light the candle cannot be ruled out. Although we believe there are more indicators pointing to the electric blanket and there for [sic] we are listing that as the probable cause of this fire.

Doc. 85, Exh. C. His report includes a diagram of the bedroom which shows the location of the bed, the blanket control, the receptacle, the breaker panel, the computer desk and the candle.

In his deposition, Komarek said he knew generally of NFPA 921 fire investigation standards and knows "some of the stuff that's in it," but he was not intimately familiar with it and did not attempt to follow it in his investigation. Among other things, Komarek testified that the point of origin of the fire had to be along the east wall, towards the northeast corner of the bedroom. He said the bed and mattress was destroyed, with heavy charring and damage to the east side of the room, where the bed was located. On the west side of the room, where the computer desk and candle were located, some stuff had melted from the heat, but there was no fire exten-

sion there. The only thing plugged in on the east wall was the electric blanket. He could not recall if there was a television in the room. Komarek said he could not tell by looking at the blanket control, which was partially melted, whether it was in the "on" position. He said he later went to Wal–Mart and examined the same type of blanket and determined that the Pekarek control had been in the "on" position. Komarek talked to Adam Pekarek after the fire and Pekarek told him about trying to light a candle and throwing the match in the kitchen trash can. Komarek subsequently found the match in the trash can, although the match head was missing. He went to the candle to see if the match head could be located, but found nothing. The heat in the room had "melted the candle smooth," according to Komarek, and he said the distance from the candle to the area of origin of the fire was about eight feet.

Komarek said when he had first entered the bedroom, the firefighters had pulled up the futon bed into a "couch" position. At the end of the firefighting phase, there was some concern that the fire might have crept into the wall, so firefighters took some sheet rock or paneling off the wall and pulled out insulation to make sure the fire was extinguished. In Komarek's subsequent investigation, they began taking things apart piece by piece, including pieces of insulation and mattress, in the area where the fire originated. What was left of the bed would have been taken out of the room at that point. Komarek recalls there were a lot of blankets on the floor. At some point he determined there was an electric blanket down there, and spoke to Diana Pekarek to get information about the blanket. Komarek said he examined the breaker box for hot connections, melted wires or shorts, or anything to indicate the fire might have originated in the box. He saw nothing that "raised a

red flag." He said two breakers were in the off position [4], but he did not attempt to trace the circuits. He concluded the area of origin was in the northeast corner, down low, based on the burn marks. The electric blanket was located in that area, and at that point he was "pretty much concentrating on the electric blanket" as being a possible cause. Komarek gathered certain evidence from the fire, including the electric blanket remains, and he took statements or got copies of statements of the two boys who had been in the house. He testified that all indications pointed to the electric blanket as the cause of the fire. He apparently ruled out the candle as a source based on its location, and ruled out the breaker box based on the burn patterns and the Pekarek's statements indicating they had no unusual electrical problems.

*B. Summary of Defendant's Argument.* Sunbeam points out that Chief Komarek is not certified as a fire investigator, and that he admitted not being completely familiar with or following the NFPA 921 guidelines in his investigation. Defendant contends these guidelines embody the accepted standard of care for fire investigations. It argues Komarek does not possess the minimum qualifications necessary to offer opinions as to the cause of the fire. It contends the underlying basis for his conclusion is merely— as he said at one point in his deposition— that he "just really feel[s] like—the origin's with this blanket."

Defendant argues Komarek's opinions are not the product of the reliable principles and methods, as shown by the fact that he failed to follow the methodology in NFPA 921. Furthermore, he did not reliably apply such principles to the facts of the case, because he did not rule out all

other possible sources of ignition of the fire. Defendant says Komarek's recognition that the attempt to light a candle was a possible cause of the fire is inconsistent with his conclusion that the blanket caused the fire, and will confuse the jury. It argues he should be precluded from providing any expert testimony as to the cause of the fire.

Finally, defendant argues Komarek's opinions are not based upon sufficient facts and data. It says he found the blanket to be the cause of the fire based only the fact that it was located in the room where the fire originated. Moreover, it says he based his conclusion upon an erroneous belief that the blanket was virtually destroyed in the fire, and that he failed to document or determine whether the electric blanket was on the floor when the fire started.

██ *C. Discussion.* At the outset the court notes defendant has not asked the court to exclude all of Chief Komarek's testimony, but only his opinion that the electric blanket was the cause of the fire. Doc. 104 at 2. Defendant concedes Komarek can properly testify as a fact witness about his observations at the fire scene. And as plaintiffs point out, a large portion of Komarek's testimony consists of such observations. Plaintiffs also point out that Komarek's report and testimony include an opinion identifying the point in the room where the fire originated. Doc. 99 at 6. Defendant's motion does not specifically address that opinion.

According to Chief Komarek's deposition testimony, the Ellinwood Fire Department is a volunteer department. Komarek's full-time job is as a lineman with the City working on electrical lines, which he

---

**4.** Komarek's report says "there were two breakers in the trip position." In his deposition, however, he said, "I shouldn't say that they was [sic] necessarily tripped. They were

in the off position. I don't know if they were on prior to—prior to the fire or not." Komarek Depo. at 34.

has done for 24 years. He was a police officer for two years before that. He has been a firefighter for 25 years. He has had various types of training for his position, including the basic Firefighter I course, numerous courses on special rescue, and fire investigation courses. He is also a paramedic. His job duties include fire investigation. His testimony shows that he was only somewhat familiar with NFPA 921 and did not attempt to use it as a guide in his investigation. As defendant points out, many courts have described the methodology in NFPA 921 as "a peer reviewed and generally accepted standard in the fire investigation community." *See Workman v. AB Electrolux Corp.,* 2005 WL 1896246, *10 (D.Kan., Aug. 8, 2005). On the other hand, courts have said a failure to strictly adhere to NFPA 921 does not render an investigation *per se* unreliable. *American Family Mutual Ins. Co. v. Hewlett–Packard Co.,* 2008 WL 2130217 (D.Minn., May 19, 2008).

■ "To qualify as an expert, the expert must possess such 'knowledge, skill, experience, training, or education' in the particular field as to make it appear that his or her opinion would rest on substantial foundation and would tend to aid the trier of fact in its search for the truth." *Sprint Comm. Co. L.P. v. Vonage Holdings Corp.,* 500 F.Supp.2d 1290, 1344 (D.Kan.2007) (*citing LifeWise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir.2004)). The court is satisfied at this point that Komarek has sufficient training and experience in firefighting and investigation to express an opinion about the likely point of origin of the fire—that is, the location in the room where the fire started. As noted above, defendant has not specifically challenged that opinion, and Komarek's knowledge and training in the characteristics of fire, as well as his experience in investigation and his observation of the scene, appear to sufficiently to qualify him to express a reliable and informed opinion on the point of origin. Defendant can of course challenge any such conclusion through cross-examination.

The principle underlying NFPA 921 is use of the scientific method, which according to the Guide requires a fire origin and cause investigator to: (1) recognize the need to determine what caused the fire; (2) define the problem; (3) collect data; (4) analyze the data (inductive reasoning); (5) develop a hypothesis based on that data; and (6) test the hypothesis (deductive reasoning). *Workman, supra;* Doc. 104, Exh. H. As plaintiffs point out, Chief Komarek basically followed that approach. Doc. 99 at 15–19. The mere fact he did not cite or use NFPA 921 as his guide does not necessarily mean he failed to use a reliable method. Defendant's repeated assertion that Komarek "failed to follow NFPA 921" is thus too vague a basis to preclude his testimony. Defendant also argues that Komarek's conclusions are based upon mere feelings or subjective opinions, rather than hard facts and data. But the witness's report and testimony show that, for the most part, he made apparently rational conclusions drawing upon knowledge of fire behavior and by applying that knowledge to relevant information and the facts he gathered. He examined burn marks and other evidence to determine the point of origin of the fire, and concluded it was down low in the northeast corner of the bedroom, essentially under or next to the bed. He found this was confirmed by the burn pattern on the bed and the amount of charring on the floor. Defendant has not identified anything improper about the witness's method of making those determinations. Komarek considered the breaker panel as a source, given its location, but examined it and ruled it out based in part on burn marks showing the fire burned below and on the outside of the panel rather than from the inside. He saw no apparent short-circuits or other

likely sources of the fire at the panel. He determined from examination that the candle was across the room and was "in no way near the point of origin" (although he did not rule out the attempt to light the candle as a possible cause). He examined evidence near the point of origin, and it was at that point that he discovered the electric blanket, which he determined to be the only electrical appliance in the immediate vicinity. He determined the blanket was plugged in to the receptacle, and he later engaged in follow-up investigation to determine if the controller for the blanket had been in the "on" position. He gathered up the blanket and preserved it for evidence (although the terminal block was apparently not recovered). Defendant is correct in asserting that Komarek could have done a better job of noting and documenting the location of certain items in the room, including the precise location of the electric blanket, a television set that was apparently in the room, and a power strip that the computer may have been plugged into. But such deficiencies, while grounds for cross-examination, are not sufficient to preclude a jury from hearing and considering his opinion testimony as to the point of origin or his opinion ruling out specific items such as the breaker panel and the candle (although not the attempt to light it) as possible causes of the fire. Cf. *George v. Ronco Inventions, LLC.*, 2004 WL 546898 (D.Kan., Mar. 2, 2004) (A review of the witness's report reveals no significant gaps in deductions, nor any basis for viewing his conclusions as so unreliable or irrelevant as to justify exclusion).

As to Chief Komarek's opinion that the probable cause of this fire was the electric blanket, however, the court concludes that the witness failed to follow a reliable method in reaching that conclusion. As defendant points out, the witness apparently based his opinion in part upon an erroneous factual belief that the blanket material was largely destroyed in the fire, when in fact it appears that the edges of the blanket burned (including an area of the PTC cable), but otherwise the blanket largely survived the fire. Komarek thus failed to fully consider and take account of the specific condition of the blanket in determining the source of the fire. The failure to fully consider the condition of the primary item suspected to be the fire's source cannot be considered a reliable method of fire investigation. Komarek also apparently failed to undertake any investigation to determine the specific manner or mechanism that allegedly ignited the fire. Also troubling is Komarek's failure to investigate or consider the significance of the two tripped or off circuit breakers in the panel, and whether their condition provided any evidence of the source of the fire. Additionally, Chief Komarek's report and deposition testimony reflect a failure to fully account for what was obviously a possible alternative cause of the fire—Adam Pekarek's attempt to light a candle. In his report, Komarek states only that Adam Pekarek could not light the candle "so he blew out the match [and] put it in the kitchen trash...." The report fails to note or clarify exactly how Pekarek handled the match. In his deposition, Komarek stated:

I do not recall asking him the fashion in which he put out the match. And if he did give me an answer, I don't recall what that answer was. You know, did he blow the match out? Did he shake the match? I just—you know, there was some suspicion of timing here where he had just went to light the candle, and within ten minutes after that the fire started. But I still—I mean I can't 100 percent say that that's not part involvement, but I would go 99 percent with this, just again, because there's just [Q. The location?] The location is just—you know, had he shook the match, it would not be impossible for the match head to go over there. But I just really feel like—the origin's with this blanket.

Doc. 85, Exh. D, p. 55. Komarek later said he was sure Adam "told me he put the match out and he put it in the trash can in the kitchen," but Komarek was "just not real clear whether he stated—I want to believe that he told me he blew it out, but I can't swear to that." *Id.* at Pp. 59–60. The record indicates that Komarek never made any inquiry to determine precisely what Adam did with the match—such as whether or not he shook it—and thus failed to consider a relevant circumstance that could alter his conclusion that there were "more indicators pointing to the electric blanket." In fact, Adam Pekarek testified in his deposition that he burnt his fingers while attempting to light the candle, a fact that could be material in assessing whether Pekarek somehow caused a portion of the match to move some distance from the candle.[5] Chief Komarek failed to pursue this line of inquiry, however, which undermines the reliability of his method of determining that the blanket was the probable cause of the fire. In sum, for the reasons stated above, the court concludes Chief Komarek's opinion that the blanket was the probable cause of this fire does not satisfy the requirements of *Daubert* and should not be admitted at trial. In that respect, the defendant's motion in limine with respect to Chief Komarek's expert testimony is granted.

## IV. Defendant's Motion to Exclude Expert Testimony of Reid Kress, Ph.D.

Sunbeam also moves to exclude expert testimony of Dr. Kress. In response, plaintiffs have withdrawn their designation of Dr. Kress as an expert witness. Doc. 100 at 1. They reserve the right to call Dr.

Kress as a fact witness, or to rebut any testimony suggesting that Kress did not form an opinion in the matter. Accordingly, the court will deny this motion in limine on grounds of mootness.

## V. Defendant's Motion for Summary Judgment.

The defendant moves for summary judgment, arguing the plaintiffs have no evidence to prove there is a defect in the design, manufacture or warnings of the subject electric blanket, or to prove that any such defect was the proximate cause of the fire. Defendant further argues there is no evidence to support the claim for punitive damages or the claim under the Kansas Consumer Protection Act. Lastly, defendant contends it is entitled to summary judgment based on plaintiffs' spoliation of key evidence.

### A. Uncontroverted Facts.

The court finds the following facts to be undisputed for purposes of summary judgment. Because a motion for summary judgment requires the court to view the record in the light most favorable to the non-moving party, the court has drawn all reasonable inferences and resolved all genuinely disputed facts in favor of the plaintiffs for purposes of this motion. Also, despite the plaintiffs' failure to fully comply with Rule 56.1 of this court, the court has attempted to set forth the facts as disclosed by the materials cited.

### 1. Defendant's statement of facts.

Purchase and Use of the Subject Blanket.

1. The subject fire occurred on January 25, 2004, at 401 South Kennedy Ellin-

---

5. Plaintiffs contend Adam Pekarek's deposition testimony shows he did not shake the match. The deposition testimony cited by plaintiffs, however, is decidedly ambiguous on that question. See Doc. 99 at 11. Moreover,

Chief Komarek's method of arriving at a conclusion as to the cause of the fire is unreliable for several reasons, including because he failed to follow up and fully consider the evidence as to what Adam did with the match.

wood, Kansas. (Ellinwood Fire Report, Donald Moos Deposition Exhibit 2, attached hereto as Exhibit A.)

2. Adam Pekarek lived with Kevin and Diana Pekarek from right after Thanksgiving in 2003. (D. Pekarek Depo., p. 9, attached hereto as Exhibit B.)

3. Adam Pekarek moved in with his father, Kevin Pekarek, and his stepmother, Diana Pekarek, after he was released from Larned State Hospital. (K. Pekarek Depo., p. 18, attached hereto as Exhibit C.)

4. Adam Pekarek had been in Larned State Hospital because he had tried committing suicide. (A. Pekarek Depo., p. 11, attached hereto as Exhibit D.)

5. Kevin and Diana Pekarek bought an electric blanket for Adam for Christmas. (K. Pekarek Depo., p. 41, Exhibit C.)

6. Diana Pekarek purchased the electric blanket. (D. Pekarek Depo., p. 15, Exhibit B.)

7. Instructions came with the electric blanket. (A. Pekarek Depo., p. 27, Exhibit D.)

8. The electric blanket came with the following instructions/warnings:

AS WITH ALL ELECTRICAL PRODUCTS, MISUSE OF PRODUCT OR FAILURE TO FOLLOW INSTRUCTIONS MAY CAUSE OVERHEATING, FIRE, OR PERSONAL INJURY. READ THE PRODUCT LABEL AND THIS INSTRUCTION BOOK BEFORE USING THE BEDDING.

1. Do not use this blanket with an infant, a child, an incapacitated person, a paraplegic, a quadriplegic, a diabetic, one insensitive to heat, or anyone who cannot clearly understand the instructions and/or operation of the controls.

2. Do not use with damaged cords. Do not trap, cross, or pinch cords between bed slats, mattresses, or springs, or against walls, footboard, or bed frame.

3. Do not dry clean this blanket. Cleaning liquid may have a deteriorating effect on the insulation of the heating element. Improper laundering may cause a heating wire displacement which can result in a fire hazard.

4. Do not subject the heating wire to damage by pinching, severe flexing, or exposure to abrasion. Damaged heating wire may result in possible overheating or fire.

5. Turn off the electric current when the blanket is not in actual use.

6. Do not use pins; they may damage the electric wiring.

7. Be sure this blanket is used on an A.C. supply circuit of 110–120 volts.

8. Keep all dogs, cats and other pets away from this blanket. This is an electric appliance that they can damage, or be injured by.

9. Do not use on a waterbed, sofa, bunk bed, or mechanically adjustable bed.

10. Do not use more than one electric heating device on the bed at the same time as a blanket or mattress pad or heating pad.

11. Use the same size blanket, as stated on the packaging and blanket label, as the corresponding bed size; for example "Twin Size" on a twin bed.

12. If improper operation or damage of this blanket is observed, discontinue its use immediately and consult the manufacturer or an authorized dealer regarding its repair.

(Product warning, attached hereto as Exhibit E.).

9. Adam Pekarek did not read the blanket's instructions. (A. Pekarek Depo., p. 27, Exhibit D.)

10. Diana Pekarek did not read the instructions that came with the electric

blanket. (D. Pekarek, Depo., p. 26, Exhibit B.)

11. Kevin Pekarek did not read any of the instructions that accompanied the electric blanket. (K. Pekarek Depo., p. 42, Exhibit C.)

12. Adam Pekarek slept on a futon in Plaintiffs' home. (A. Pekarek Depo., p. 20, Exhibit D.)

13. The futon was made of a metal frame. (D. Pekarek, Depo., p. 30, Exhibit B; A. Pekarek Depo., p. 30, Exhibit D.)

14. The futon is like a small couch that pulls out into a bed. (K. Pekarek Depo., p. 38, Exhibit C.)

15. The futon opens up into a double, full sized bed. (D. Pekarek Depo., p. 14, Exhibit B.)

16. The electric blanket fit on top of the bed, but did not extend over the sides of the bed. (D. Pekarek, Depo., p. 17, Exhibit B.)

17. Adam Pekarek never made his bed and just left the blankets and sheets in a big pile. (A. Pekarek Depo., pp. 20–21, Exhibit D.)

18. According to Adam Pekarek, he had the electric blanket on the bottom and an Oakland Raiders blanket on the top; he slept underneath both blankets. (A. Pekarek Depo., pp. 39–40, Exhibit D.)

19. During the relevant time period, the Pekareks had two Chihuahuas and a Labrador. (K. Pekarek Depo., p. 11, Exhibit C.)

20. The dogs had free access to all rooms in the house. (K. Pekarek Depo., pp. 11–12, Exhibit C; A. Pekarek Depo., p. 35, Exhibit D.)

21. From time to time, all of the dogs slept with Adam Pekarek. (A. Pekarek Depo., p. 35, Exhibit D.)

22. The electric blanket was plugged in underneath the futon. (A. Pekarek Depo., p. 22, Exhibit D.)

23. The outlet for the blanket was right underneath the futon by the wall. (A. Pekarek Depo., p. 23, Exhibit D.)

24. The wire from the outlet went around the side of the futon along the floor and plugged into the blanket at the end. (A. Pekarek Depo., pp. 25–26, Exhibit D.)

25. The futon was up against the wall. (A. Pekarek Depo., p. 28, Exhibit D.)

26. There was a little gap between the futon and the wall so that Adam Pekarek could reach his hand down to operate the blanket's controller. (A. Pekarek Depo., p. 29, Exhibit D.)

27. The cord that attached the control to the blanket went between the futon's metal frame and the fabric of the futon. (A. Pekarek Depo., pp. 29–30, Exhibit D.)

28. The electric blanket was on almost continuously from the time Adam Pekarek received it for Christmas, until the time of the fire. (A. Pekarek Depo., pp. 21, 31, Exhibit D.)

29. The electric blanket was usually set on one of its highest settings (i.e., 7, 8 or 9). (A. Pekarek Depo., p. 29, Exhibit D.)

30. Adam Pekarek's bedroom also contained a computer and a television. (A. Pekarek Depo., p. 42, Exhibit D.)

The Incident.

31. On the date of the fire, Adam Pekarek tried to light a candle on the computer desk. (A. Pekarek Depo., p. 31, Exhibit D.)

32. Adam Pekarek did not light the candle because its wick was pushed too far into the wax. (A. Pekarek Depo., p. 32, Exhibit D.)

33. Adam Pekarek burned his fingers on a match while trying to light the candle. (A. Pekarek Depo., p. 33, Exhibit D.)

34. Adam Pekarek blew the match out, went to the kitchen, and put the match in

the trash can. (A. Pekarek Depo., p. 33, Exhibit D.)

35. While in the kitchen, Adam Pekarek began doing the dishes and smelled something burning. (A. Pekarek Depo., p. 19, Exhibit D.)

36. When Adam Pekarek smelled the smoke, he looked around but did not see anything. He looked around again and smoke was pouring out of his room. (A. Pekarek Depo., p. 36, Exhibit D.)

37. Adam Pekarek went to his bedroom and discovered that his bed was on fire. (A. Pekarek Depo., p. 19, Exhibit D.)

38. Adam Pekarek discovered the fire about twenty minutes after he attempted to light the candle in his bedroom. (A. Pekarek Depo., p. 34, Exhibit D.)

39. The City of Ellinwood Fire Department responded to the scene of the fire (Ellinwood Fire Report, Exhibit A.)

40. Fire Chief Chris Komarek assumed command for the scene upon his arrival. (Komarek Depo., p. 11, attached hereto as Exhibit F.)

41. In his report, Komarek observes: "Due to the time frames surrounding this fire and the attempted lighting of the candle the possibility that in some fashion this fire was caused by the attempt made to light the candle cannot be ruled out." (Ellinwood Fire Report, p. 6, Exhibit A; Komarek Depo., pp. 54–55, Exhibit F.)

42. Komarek confirmed that a match was found in the trash can in the kitchen, but the match head was missing. (Komarek Depo., pp. 26, 27, Exhibit F.)

Product Characteristics.

43. The subject electric blanket contained circuitry that is known within Sunbeam as Circuit 104. (Affidavit of Richard J. Prins, ¶ 4, attached hereto as Exhibit G.)

44. The Circuit 104 technology and circuitry has been used by Sunbeam in the manufacture of its electric blankets since May 1, 2000. (Affidavit of Richard J. Prins, ¶ 4, Exhibit G.; Pretrial Order, p. 3, ¶ 10.)

45. Controverted.

46. The Circuit 104 is different in design, construction, operation and function than prior circuits used in PTC electric bedding products, including the triode-based circuit. (Affidavit of Richard J. Prins, ¶ 5, Exhibit G.)

47. Controverted.

48. There are differences between the Circuit 104 and the triode-based circuit as to the function and ability of each circuit to detect and react to various conditions in the product that may call upon the circuit to shut off electric power to the product. (Affidavit of Richard J. Prins, ¶ 7, Exhibit G.)

49. Sunbeam electric blankets use a PTC (positive temperature coefficient) heating element. (John D. Loud, P.E. Report, dated May 4, 2006 ("Loud Report"), p. 4, attached hereto as Exhibit H.)

50. This type of PTC heating element is designed to be "self-regulating," in which a localized increase in temperature results in a corresponding increase in resistance of the PTC heating wire in that region. (Loud Report, p. 4, Exhibit H.)

51. Increased resistance causes a subsequent reduction in current flow in that region. (Loud Report, p. 4, Exhibit H.)

52. This reduced current flow then reduces the power dissipation, thereby reducing the temperature, making it cooler. (Loud Report, p. 4, Exhibit H.)

53. This cycle of small resistance, current and temperature changes is designed to safely maintain near-constant heating over the entire blanket. (Loud Report, p. 4, Exhibit H.)

54. PTC wire has been proven to be an extremely robust material, capable of operating properly after withstanding high levels of direct physical abuse. (Loud Report, p. 4, Exhibit H.)

55. Testing that included pounding of the wire with a hammer, compressing it with pliers, damaging it with a pushpin, and repeatedly bending and twisting the PTC wire at the same location produced no faults. (Loud Report, p. 4, Exhibit H.)

56. After each abuse test, the PTC wire was found to function properly. (Loud Report, p. 4, Exhibit H.)

57. The design of Sunbeam electric blankets is a patented technology. (Loud Report, p. 4, Exhibit H.)

58. The safety circuit is designed to disconnect power to the blanket heating wires whether the fault condition consists of a short circuit or an open circuit. (Loud Report, p. 4, Exhibit H.)

59. The safety circuit is located where the power input cord attaches to the foot of the blanket. (Loud Report, p. 4, Exhibit H.)

60. Sunbeam electric blanket controls include a fuse, which is designed so that shorting of heating elements in a blanket connected to a residual electrical system opens the power circuit and disconnects wall power from the blanket's heating elements. (Loud Report, p. 4, Exhibit H.)

61. Sunbeam electric blanket controls also include a triac, which is designed so that when a heating wire in the blanket is broken, a fault which produces an open circuit, the triac stops conducting current and power is disconnected from the wall to the blanket. (Loud Report, p. 4, Exhibit H.)

62. The design of the electric blanket, and the warnings provided to the consumer with the electric blanket that was present at the time of the incident are listed as safe for household use by UL (Underwriters Laboratories, Inc.) under UL 964, the safety standard for electric blankets. (Loud Report, p. 5, Exhibit H.)

63. The safety verification of this specific product is noted by the mark on the label "Listed E23623" and the UL logo, which can clearly be seen in the inspection photographs. (Loud Report, p. 5, Exhibit H.)

64. The remains of the subject electric blanket indicate that it is of a twin size and the control has a date code of "T204DE," which means it was manufactured on July 23, 2003. (Richard J. Prins Report, 5/4/06 ("Prins Report"), attached hereto as Exhibit I.)

65. Controverted.

66. The control's fuse is intact and the triac (electronic switching device) is intact and not shorted. (Prins Report, Exhibit I.)

Plaintiffs' Expert Witnesses.

67–72. These statements relate to Dr. Cronenwett's report and testimony. The court finds the uncontroverted facts on these points are set forth in the prior discussion of defendant's motion in limine.

73. Cronenwett did not find any manufacturing defect in the subject blanket's line cord. (Cronenwett Depo., p. 26, attached hereto as Exhibit L.)

74. Cronenwett is of the opinion that the blanket cord did not short circuit. (Cronenwett Depo., p. 29, Exhibit L.)

75. Cronenwett cannot point to any specific defect or failing in the blanket connector assembly. (Cronenwett Depo., p. 37, Exhibit L.)

76. Cronenwett did not see any evidence of any defect that would have started a fire in the PTC wire. (Cronenwett Depo., p. 39, Exhibit L.)

77. Cronenwett cannot say where the subject product failed. (Cronenwett Depo., p. 34, Exhibit L.)

78. Cronenwett cannot offer any testimony as to manufacturing defects in the Pekarek blanket. (Cronenwett Depo., pp. 40–41, Exhibit L.)

79. Cronenwett has no direct [6] physical evidence in this case that there was a short circuit in the PTC wire. (Cronenwett Depo., pp. 53–54, Exhibit L.)

80. No direct physical evidence exists in this case indicating that a single strand of two-strand alloy conductor broke in a manner that would not trigger the safety circuit because of a design deficiency. (Cronenwett Depo., pp. 54–55, Exhibit L.)

81. No direct physical evidence exists of an overheat situation in the PTC cable. (Cronenwett Depo., p. 56, Exhibit L.)

82. No direct physical evidence exists indicating that a break occurred in one of the conductors of the PTC heating element to which the safety circuit did not respond. (Cronenwett Depo., p. 56–57, Exhibit L.)

83. No direct physical evidence exists indicating that the Circuit 104 did not work. (Cronenwett Depo., pp. 57–58, Exhibit L.)

84. Cronenwett performed some testing on the Circuit 104 to prove his theory that the circuit may not operate if there is a local overheat in the PTC cable. (Cronenwett Depo., pp. 43, 45, Exhibit L.)

85. In conducting this testing, Cronenwett applied an outside heat source to PTC cable to cause an overheat situation. (Cronenwett Depo., p. 45, Exhibit L.)

86. Cronenwett, however, did not record any portion of his testing. (Cronenwett Depo., p. 47, Exhibit L.)

87. Cronenwett did not maintain notes of his testing, his testing has not been the subject of peer review, and he has published nothing on the testing. (Cronenwett Depo., p. 47, Exhibit L.)

88. Cronenwett has not discussed his theory with any other scientist, and he did not record the data from his testing. (Cronenwett Depo., p. 48, Exhibit L.)

89. Cronenwett does not know the specific temperature reached to create the overheat. (Cronenwett Depo., pp. 48–49, Exhibit L.)

90. *In the matter of Medford v. Sunbeam, U.S. District Court for the District of Kansas,* No. 03–1017–JTM, which involved allegations against an electric blanket that contained a Circuit 100 safety circuit, Cronenwett's written report states the following with respect to the Circuit 104:

> The new Circuit 104 provides short and open circuit protection over the entirety of the PTC wire within the blanket as well as all components up to the control on the blanket cord. I have reviewed Mr. Prins' deposition extract confirming that this new Safety Circuit has essentially eliminated fire claims and protects against all of the above-described defects.... [T]he Circuit 104 also protects against virtually all foreseeable misuse or abuse by the consumers which had previously been the subject of ineffective warnings.

(Cronenwett Report on the Medford Electric Fire, p. 18, attached hereto as Exhibit M.)

91. At his deposition in this case, Cronenwett agreed with his prior statement in

---

**6.** The court uses the term direct here to distinguish between direct and circumstantial evidence. As the court discusses infra, the state of the evidence in this case will allow the plaintiffs to argue that circumstantial evidence supports the existence of one such a fault.

his expert report for the Medford case (Cronenwett Depo., p. 42, Exhibit M.)

92. Cronenwett testified that he did not perform any cause and origin investigation into the subject fire. (Cronenwett Depo., p. 9, Exhibit M.)

93. Cronenwett is not giving origin and cause testimony in this matter. (Cronenwett Depo., p. 31, Exhibit M.)

94. Cronenwett acknowledged that his opinions are applicable in this case only if the subject electric blanket is singled out as the cause of the fire; in which case there are a number of mechanisms that could have started the fire. (Cronenwett Depo., p. 10, Exhibit M.)

95. Cronenwett conceded that it is possible that the Pekarek fire could have been caused by a source other than the electric blanket as he did not eliminate other potential causes of the fire. (Cronenwett Depo., p. 10, Exhibit M.)

96. In his report, Cronenwett indicates that Reid Kress investigated this matter and is of the opinion that the fire originated in the electric blanket, to the exclusion of other ignition sources. (Cronenwett report, p. 2, at 3 Exhibit K.)

97–113. Plaintiffs have withdrawn their designation of Reid Kress as an expert witness.

114–119. These facts refer to the investigation of Chris Komarek. The court incorporates by reference its statement of the relevant facts from the previous motion in limine.

E. Spoliation.

120. Plaintiffs and their property insurance company, American Family, knew within a couple of days of the fire that Sunbeam's electric blanket was being implicated as a possible cause of the fire. (Komarek Depo., pp. 26, 43–44, Exhibit F.)

121. Neither Plaintiffs, their insurance company, nor their respective representa-

tives placed Sunbeam on notice of the incident until the fire scene had been cleared and all of the physical evidence in the room of origin had been removed. (3/12/04 Letter from Bryan Fisher to Sunbeam Legal Department, attached hereto as Exhibit P.)

122. Controverted.

Punitive Damages Claim.

123. Plaintiffs seek punitive damages against Sunbeam. (Pretrial Order, p. 18.)

124. Plaintiffs have stipulated that in early 2000, Sunbeam began utilizing the new Circuit 104, which is at issue in this case, and admitted that the Circuit 104 is "more effective than the previous safety circuits in detecting and reacting to some of the known and expected fire causing defects and conditions in Sunbeam PTC electric blankets." (Pretrial Order, p. 3, ¶ 10; Amended Complaint and Demand for Trial by Jury [hereinafter "Amended Complaint"], p. 13, ¶ 62.)

125. Plaintiffs further acknowledge that even prior to introducing the Circuit 104, Sunbeam began utilizing a new design of safety circuit for use in its electric blankets known as the Model 602, and that upon learning that some of those products had been involved in fire incidents, it discontinued manufacturing blankets with such a design and issued a recall. (Amended Complaint, p. 89, ¶¶ 41, 43–44.)

*2. Plaintiffs' Additional Facts.*

The Electric Blanket.

1. The electric blanket at issue was manufactured by Sunbeam Products, Inc., and its control bears a manufacturing date code of July 23, 2003 [Report of Richard Prins]

2. The electric blanket was purchased by Kevin Pekarek and Diane Pekarek at a Wal–Mart store a few weeks before the

fire as a Christmas present for their son Adam Pekarek. [Kevin Pekarek Deposition, pg. 41]

3. The electric blanket is a twin size, single control, Sunbeam electric blanket which utilized a Positive Temperature Coefficient [PTC] technology heating element and what is known by Sunbeam as the Circuit 104 safety circuit. [Expert Reports of Richard Prins, John Loud, and William T. Cronenwett, Ph.D.]

The Fire.

4. On January 25, 2004, a fire occurred in the Pekarek home, located at 401 South Kennedy, Ellinwood, Kansas. [Kevin Pekarek Deposition, pgs. 6–7, and Ellinwood Fire Report]

5. Adam Pekarek discovered the fire. [Adam Pekarek Deposition, pg. 37]

6. When Adam Pekarek discovered the fire, the fire was on the top of the bed. [Adam Pekarek Deposition, pg. 37]

7. The fire was in the middle of the bed where the blankets were bunched up. [Adam Pekarek Deposition, pg. 38]

8. Adam Pekarek indicated the location of the fire on top of the bed on a drawing he made during his deposition. [Adam Pekarek Deposition, pg. 38, and Deposition Exhibit 35]

9. When Adam Pekarek discovered the fire there were flames nowhere else in the room, just on the bed. [Adam Pekarek Deposition, pg. 39]

10. When Adam Pekarek discovered the fire the flames were not on the floor, but only on top of the bed. [Adam Pekarek Deposition, pg. 39]

11. Twenty minutes prior to discovering the fire on the bed in his bedroom, Adam Pekarek had unsuccessfully tried to light a candle with a twelve inch long fireplace style match. [Adam Pekarek Deposition, pgs. 31–33]

12. The wick of that candle was pushed down into the candle and would not light, so he blew the match out and threw it away in the kitchen trash can. [Adam Pekarek Deposition, pgs. 31–33]

13. The candle he tried to light was on a computer desk, across the room from the bed. [Adam Pekarek Deposition, pgs. 31, and Deposition Exhibit 35]

14. The match in fact was found in the kitchen trash can during Chief Komarek's investigation. The match head was missing. [Komarek Deposition, pg. 26]

15. Adam Pekarek did not shake or flick his wrist to put out the match, he blew it out. [Adam Pekarek Deposition, pgs. 32–33, and 44]

16. Adam Pekarek had an electric blanket on his bed. [Adam Pekarek Deposition, pgs. 21–22]

17. He had a habit of leaving it turned on. [Adam Pekarek Deposition, pgs. 21–22]

18. The Ellinwood Fired Department was called and extinguished the fire. [Ellinwood Fire Report]

19. Investigation of the fire scene was conducted by the Fire Chief of the Ellinwood Fire Department, Chris Komarek. [Ellinwood Fire Report and Komarek Deposition]

20. Chris Komarek, the Fire Chief for the Ellinwood Fired Department, examined the fire scene and made certain factual observations. [Komarek Deposition]

21. Chief Komarek's general observations of the fire scene include such factual observations as where some objects were located and the condition they were in. [Komarek Deposition]

22. Chief Komarek observed at the scene, and prepared a diagram of the scene showing such things as the location of the bed in the room, the location of a

computer desk in the room, the location of a candle on the computer desk, the location of an electrical receptacle on a wall, and the location of an electric blanket control in the room. [Ellinwood Fire Report]

23. Chief Komarek determined that there was an electric blanket in the bedroom. [Komarek Deposition, pg. 31]

24. Chief Komarek himself found the electric blanket, and he found it plugged in. [Komarek Deposition, pg. 36]

25. Chief Komarek saw that the electric blanket control was plugged into the wall. [Komarek Deposition, pgs. 31, 32, and 36]

26. Chief Komarek observed the only thing that was plugged in on this wall was the electric blanket. [Komarek Deposition, pg. 20]

27. Chief Komarek found no other heat producing devices in the area where he determined the fire to have originated. [Komarek Deposition]

28. Chief Komarek has twenty-five years of fire fighting experience, as well as training, experience, and formal education in fire investigation. [Komarek Deposition, pg. 7]

29. Chief Komarek's investigation led him to the conclusion that the room of origin of the fire was the bedroom, as it was the only room that had any fire damage. [Komarek Deposition, pg. 16–17.]

30. Chief Komarek's investigation led him to the conclusion that the area of origin of the fire was along the east wall, towards the northeast corner of the bedroom. [Komarek Deposition, pg. 16–17]

31. Chief Komarek's investigation of the point of origin led him to the discovery of the remains of what was determined to be an electric blanket. [Komarek Deposition, pgs. 20, 31, and 35]

32. Also found in that area was what appeared to be the control for that electric blanket. [Komarek Deposition, pg. 32]

Potential Misuse.

33. There is no direct physical evidence in the record that there was any damage to the electric blanket or its cords caused by the consumer or how the consumer used this product.

34. No expert for either plaintiffs or defendant has found any evidence of direct short circuiting of the blanket electrical power cord or connecting cord. [Cronenwett Report p. 2, Prins Report, Loud Report, p. 8]

35. Dr. Cronenwett found no evidence of electrical short circuit melts on the blanket power cord or blanket connecting cord. [Cronenwett Report pg. 2]

36. The way the Circuit 104 is designed, if there were a short circuit of the blanket connecting cord, the fuse in the control would blow. [Prins Report pg. 2]

37. The fuse in the Sunbeam electric blanket is not blown. [Prins Report, Pg. 2]

38. Circuit 104 also protects against virtually all foreseeable misuse or abuse by the consumer. [Cronenwett Deposition, pg. 42]

Claim of Spoliation.

39. Sunbeam claims that plaintiffs spoliated evidence by not providing it access to the fire scene before it was cleaned.

40. The only device found at the area of origin of the fire, the remains of the electric blanket, and its control and cords, were gathered and preserved as evidence, and have been made available to Sunbeam for examination and testing. [Komarek Deposition, pg. 42, Expert Reports of Dr. Cronenwett, John Loud, and Richard Prins]

41. The electrical outlet into which the electric blanket was plugged, was salvaged from the fire scene and has been made available to Sunbeam for inspection and testing. [Expert Reports of John Loud, and Richard Prins]

42. Detailed photographs of the fire scene were taken as a part of the investigation of Chef Komarek. [Komarek Deposition, pgs. 25–26]

43. The photographs of the fire scene have been made available for inspection and testing. [Expert Reports of John Loud, and Richard Prins]

44. There is no evidence that any other potential fire causing device was not salvaged from the fire scene.

45–46. Argumentative; unsupported by citation.

Dr. Cronenwett.

47. Dr. William Cronenwett received a Ph.D. in electrical engineering in 1966. He has been a professor of engineering at the University of Oklahoma since 1968 and is now retired. Besides general courses in electrical engineering, he taught special courses on circuit analysis. [Cronenwett Vita]

48. Since the early 1980's, he has served as a forensic consultant in the investigation of fires of electrical origin, including numerous house fires where various electrical appliances have been the potential source. Since 1995, he has been involved in the review of over 70 cases wherein a Sunbeam electric bedding product was the potential cause of a fire. [Cronenwett Vita]

49. Dr. Cronenwett has reviewed about 5000 Sunbeam product examination photographs; has personally examined numerous product remains produced by Sunbeam for various defects and failure modalities; has done substantial testing of electric blankets to determine how they function and their failure modes; he has reviewed Sunbeam internal documents generated in discovery in this and other cases; he has seen the depositions or summaries of depositions of the Sunbeam engineers, managers, and consultants taken in other cases; he has reviewed pertinent literature; and has reviewed other materials as described in his report.1 [Cronenwett Report, pgs. 6–16]

50. Dr. Cronenwett's list of potential defects in gleaned from his experience in reviewing other cases, examining product remains, and review of Sunbeam's internal documents and engineering depositions. [Cronenwett Report, pgs. 7–16]

51. Dr. Cronenwett's Report lists a variety of common defects known to cause fires in Sunbeam PTC electric blankets, although as noted previously many of the examples cited by Dr. Cronenwett occurred in blankets with different safety circuits. [Cronenwett Report, pgs. 7–16]

52. A specific defect within a PTC wire that causes a fire may be destroyed in the resulting fire, leaving behind no direct physical evidence of the defect.

53. Dr. Cronenwett's Report identifies various potential defects in the wiring that could cause ignition. His opinions are based upon (1) a process of elimination; (2) the physical evidence, testimony, and familiarity with Sunbeam bedding products, and (3) known defects from review of other cases and product remains in similar cases. [Cronenwett Report].

54. Dr. Cronenwett's opinion is that if the blanket was the cause of the fire, the failure of the control safety circuit to detect and respond to a malfunction in the PTC cable conductor in the Pekarek blanket, and the resulting arcing or overheating caused by that malfunction, is the most probable ultimate cause of this fire. [Cronenwett Report, pg. 5].

55–56. Dr. Cronenwett's opinion as to the five possible ways in which the fire could have started, and the basis for that opinions, are discussed previously in the motion in limine.

57. It is Dr. Cronenwett's opinion that the PTC heating element used in the Circuit 104 containing products is substantially similar, and in fact is identical, in its electrical function, electrical design, and its potential electrical fire causing failure modes, when compared to the PTC wire used in the Circuit 100 containing products. [Cronenwett Affidavit]

58. From the examinations, experiments, and testing Dr. Cronenwett has personally conducted on PTC wire used in Circuit 104 containing products, he has confirmed that there are known fire causing failure modes that existed in the PTC heating element used in the Circuit 100 containing products, that continue to existed in the PTC heating element used in the Circuit 104 containing products. [Cronenwett Affidavit]

59. Sunbeam has taken the position as far back as the year 1975 that, "In electrical appliances such as electric blankets, it is imperative that protective devices be provided so that the blanket cannot become overheated, causing fire or injury to the user." [Cronenwett Affidavit, and Exhibit 4 thereto]

60. Neither the Circuit 100 nor the Circuit 104 containing products have protective devices provided so that the PTC wire cannot possibly become overheated. [Cronenwett Affidavit]

61. The manufacturing process for the PTC wire itself, the process that Sunbeam uses, is essentially the same for the Circuit 104 products as it was for the Circuit 100 products made in the late 1990's. [Prins Deposition, pgs. 49–50]

62. Some of the potential fire risks of Sunbeam PTC electric blankets that existed in the Circuit 100 products, as shown on the drawing of Mr. Prins, Exhibit 5 to his deposition, still exist in any Sunbeam electric blanket. [Prins Deposition, pg. 58]

63. Besides the inspection and testing mentioned elsewhere in his report, which Dr. Cronenwett conducted in prior cases, he performed one specific test applicable to this case demonstrating that Circuit 104 does not completely protect against localized overheating of the PTC wire. [Cronenwett Deposition, pgs. 43–50]

64. Sunbeam's retained expert, John Loud, conducted a similar test, and came to a similar conclusion. [Loud Deposition, pgs. 103–105, and 111]

65. Sunbeam product safety engineer Richard Prins has confirmed that Circuit 104 by design will not detect this kind of electrical fault, and it is a potential fire risk. [Prins Deposition, pgs. 65–66, and 71]

SUNBEAM PTC ELECTRIC BLANKET FIRE HISTORY

66. Since Sunbeam first went to production with this product in the early 1980's Sunbeam has been aware of the potential of these products to cause fires. [Prins Depositions Exhibits 6 and 8]

67. This design of product with the PTC heating element has been manufactured by defendant Sunbeam since approximately 1983.

68. Sunbeam has found on inspection of some of its PTC heating element electric blankets involved in fire claims that the fire was caused by the blanket, and the safety circuit did not prevent the fire. [Prins Deposition, pg. 44]

69. Sunbeam's product safety engineer, Richard Prins, has stated in an affidavit dated June 18, 2003, filed in the United States District Court for the Northern District of West Virginia that in the late

1990's through the year 2000, Sunbeam would receive on average approximately 200 fire related claims per year alleging personal injury or property damage, and an estimated 1,100 to 1,800 warranty returns, where the consumer complained that this product had smoked, sparked, smoldered or caught fire. [Prins Deposition Exhibit 10]

70. Exhibits B through E of the Prins deposition are a representative number of photographs showing Sunbeam electric blankets, and their components, which have been involved in small fires, or were in such a state that a fire was an imminent serious risk. All of these photographs were obtained upon examination and photographing of products in the possession of Sunbeam, returned to it by claimants and customers, with the complaint that the product had caught fire or was about to catch fire, and produced in discovery in this litigation. Several of these products themselves were made exhibits to the deposition of Mr. Prins taken in this case.

71. According to a memorandum written by William Rowe, a former Sunbeam engineer, dated September 20, 1983, directed to his immediate superior, Sunbeam engineer George Crowley, he projected that Sunbeam would experience approximately 500 catastrophic failures per year. Dr. Rowe has testified that "catastrophic failures" was engineer lingo for fires. This projection, however, was based upon an assumption the products would contain the C 100 triode-based safety circuit, which has since been discontinued. [Prins Deposition, pgs. 34–37, and Deposition Exhibit 9]

72. Sunbeam was aware of the fire causing propensity of the heating element during the design phase of this product. [Prins Deposition, pgs. 26–34, and Deposition Exhibits 6, 7, and 8]

73. Sunbeam's documents establish that Sunbeam knew during design and development of this product that the heating element had a potential to catch fire and, therefore, a safety circuit was needed as a means to try to prevent these fires. [Prins Deposition Exhibits 6, 7, and 8]

74. Instead of designing the product to avoid the possibility of malfunctions in the PTC wire, Sunbeam designed and patented a safety circuit, the purpose of which was to try to prevent malfunctions of these products from developing into a fire. [Prins Deposition, pg. 29, and Deposition Exhibit 7]

75. From the plain language of the Sunbeam patent it is stated that in spite of careful design and manufacturing techniques, there will be occasions when the product will malfunction, and fires will occur. Therefore, there is a need for the safety circuit. [Column 5, Lines 26 to 32 of Prins Deposition Exhibit 7]

76. This patent document proves that Sunbeam was aware of this problem of the PTC heating element causing fires since prior to its first sale of this product.

77. By the late 1990's, Sunbeam had been receiving more than a thousand fire claims per year, according to its own product safety engineer, Richard Prins. [Prins Deposition Exhibit 10]

78. In 1996, Sunbeam designed and patented what it thought would be a better safety circuit for these PTC heating element products. [Prins Deposition Exhibit 15]

79. That safety circuit became known as the Model 602. However, after going to production with the Model 602, Sunbeam immediately began to receive returns of this product where the safety circuit did not work to prevent fires caused by the PTC heating element. After only three fire incidents with the Model 602, on June 19, 1998, Sunbeam issued a recall of the 53,000 Model 602 blankets it had sold to

the public, and ceased production. [Prins Deposition Exhibits 16, 17, 18, and 19]

80. However, Sunbeam continued to manufacture PTC heating element blankets at the rate of approximately 3.5 million units per year [Prins Deposition Exhibit 11], and continued to employ the old Circuit 100 triode-based safety circuit.

81. Over the next two years Sunbeam received the thousands of fire related returns referenced in Richard Prin's affidavit. [Prins Deposition Exhibit 10]

82. On April 19, 1999 a representative of Underwriters Laboratories [UL], Allen Weber, happened to be home watching television when the ABC News program 20/20 broadcast an exposé on Sunbeam electric blanket fires. What he saw in that broadcast prompted UL to take a close new look at this Sunbeam product. Mr. Weber, testified by deposition given on November 12, 2003, in prior litigation, that the testing UL did in the Spring of 1999 demonstrated that the Sunbeam PTC electric blankets with the triode-based safety circuit, Circuit 100, did not meet the then existing UL standards. UL then gave Sunbeam one year to come up with a better safety circuit, or lose its right to include the UL Label on its PTC heating element products. [Weber Deposition, pg. 159]

83. Sunbeam again attempted to design a safety circuit that would detect the fire causing failure modes of the PTC heating element products and de-energize it before the fire began. That circuit became known as the Circuit 104. [Prins Deposition Exhibit 20]

84. However, the Sunbeam Patent for that safety circuit, once again acknowledges that the heating element has the potential to cause fires, at times will fail, and is in need of a safety circuit to try to prevent, or at least reduce the number of fires this PTC heating element will cause: When a conductor break occurs, a line voltage can develop across the break causing an arc to jump across the break. Such a break can raise the temperature of the PTC material to auto ignition, which can start a fire. [Prins Deposition Exhibit 20, Column 1, Lines 12–21]. The present invention provides a circuit for protecting users against failures of PTC wire heating elements in electrical heating appliances. [Prins Deposition Exhibit 20, Column 2, Lines 27–29]

85. The deposition testimony of Sunbeam's Product Safety Engineer, Richard Prins, taken in this case, has at least two Circuit 104 electric blankets that have been involved in fire incidents, marked as exhibits where it can be demonstrated that the safety circuit did not perform quickly enough, or as designed, to prevent the fire-related damage evident in the returned product. [Prins Deposition, pgs. 107–220]

86. Sunbeam's product safety engineer, Richard Prins has testified that under certain circumstances, Circuit 104 will not detect a local carbonized segment of the heating element, and that, "It would be a potential fire risk." [Prins Deposition, pg. 71]

87. Sunbeam's retained expert consultant, John Loud of Exponent, has testified that under certain circumstances, Circuit 104 will not detect a local carbonized segment of the heating element, and that, "It would be a potential fire risk." His testing has duplicated this condition in the lab. [Loud Deposition, pgs. 103–105, and 111].

*B. Standard Governing Summary Judgment.* Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and an

issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Because it is the role of a jury to resolve conflicts in the evidence, on summary judgment the court must examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party. *Seamons v. Snow,* 206 F.3d 1021, 1026 (10th Cir.2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, "[w]here different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons,* 206 F.3d at 1026.

### C. Discussion.

1. *Circumstantial evidence of defect and causation.* The leading Kansas authority on the use of circumstantial evidence in product liability cases is *Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 661 P.2d 348 (1983). The Supreme Court in *Mays* said a product liability claim could be based upon circumstantial evidence, even in the absence of direct evidence of a specific defect. The Court said the plaintiff:

> must produce proof of three elements. (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control. These elements may be proven inferentially, by either direct or circumstantial evidence. For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based

on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility. While a plaintiff is not normally required to prove his case at the summary judgment stage, he must present some facts to support the elements of his claim.

*Mays,* 233 Kan. at 54, 661 P.2d 348.

■ Viewing the evidence in the light most favorable to the plaintiffs, there is circumstantial evidence in the record from which a jury could find that a manufacturing, design, or warning defect in the Sunbeam blanket caused the fire in the Pekarek house. First of all, there is evidence from which a jury could conclude that the fire originated in the very spot where the electric blanket was located. There is evidence, including testimony of Chris Komarek, Adam Pekarek, and Diana Pekarek, from which a jury could reasonably find that the blanket was the only electrical and only heat-producing item in the immediate vicinity of the point of origin. The blanket in question was almost new—making product abuse or misuse an unlikely cause— and there is testimonial evidence that it was almost always left in the "on" position on a fairly high setting, from which a jury could infer it was "on" at the time of the fire. Based on Chief Komarek's testimony and circumstantial evidence, a jury could logically find that neither the circuit breaker panel nor the candle played any part in starting the fire. A jury could also reasonably conclude that no remaining appliances or other potential fire sources in the room were close enough to the point of origin to have caused the fire. At the same time, there is evidence from which a jury could find that PTC elements of the type used in this blanket have some history of failing and causing fires, and that the design of the Circuit 104 safety circuit does not detect all known malfunctions of

the PTC element and does not prevent all such fires. Dr. Cronenwett identified specific fire-causing failures of the blanket, which could have started the fire, and which in his opinion render the product unreasonably dangerous. Defendant complains that Dr. Cronenwett cannot point to any physical evidence showing that a local portion of the PTC wire actually overheated and is responsible for starting the fire. But such evidence may be unavailable because the fire destroyed a portion of the PTC wire. As was stated earlier, courts have refuted the notion that a defective product that catches fire, thereby destroying evidence of the defect, allows a manufacturer to escape liability. The court concludes that Kansas, like other states, would permit circumstantial proof of a defect under a *res ipsa loquitur*-type theory, provided the plaintiff has evidence eliminating other possible causes, the product was in the same basic condition as when it left the hands of the defendant, and the damage is of a type that normally would not occur in the absence of a defect. *Cf. Hickerson v. Pride Mobility Prods. Corp.,* 470 F.3d 1252, 1258 (8th Cir.2006) (Missouri law). *See also Mays,* 233 Kan. at 50–54, 661 P.2d 348. Under the circumstances, the plaintiffs have cited evidence to meet those elements, and they have sufficient circumstantial evidence to withstand a motion for summary judgment on their product liability claims.

A jury looking at all the evidence and weighing the probabilities of what the evidence shows could conclude there are only two realistic ways in which this fire could have started. First, a defect in the electric blanket could have caused it. Second, it could have been started by Adam Pekarek's use of a match in the room shortly before the fire. As noted above, there is substantial circumstantial evidence pointing to a defect in the blanket as the likely cause. As for Adam Pekarek's attempt to light the candle, his testimony could be viewed by a jury as refuting any possibility that he was responsible for starting the fire. And the court cannot weigh his credibility on a motion for summary judgment. A jury listening to his testimony could find that he is credible and could conclude, based on both his testimony and circumstantial evidence, that his use of a match could not have been the cause of this fire. In sum, if a jury believes his testimony, the jury could reasonably exclude the only other plausible cause of this fire other than a failure caused by a defect in the electric blanket. *Cf. Dreesen v. W.W. Henry Co.,* 1990 WL 198818 (D.Kan.1990) (evidence must negate other likely, reasonably causes).

Defendant argues plaintiffs' evidence of causation fails because they do not have an expert to identify the blanket as the cause of the fire and because "careless matches cannot be ruled as a cause." Doc. 87 at 22. In view of the evidence outlined above, however, the court is not persuaded that defendant is entitled to summary judgment. In *American Family Mut. Ins. Co. v. Grim,* 201 Kan. 340, 440 P.2d 621 (1968), the Kansas Supreme Court addressed the sufficiency of the evidence in a fire case. A lower court found a fire had been caused by a group of boys who entered a church late one evening and lighted some rolled up newspapers to use as torches. The boys testified they stamped out the torches before they left. A fire destroyed the church some time later that night. There was evidence of other possible causes of the fire, including the fact that another group of youngsters was seen in the vicinity later that night, a light was seen in the church after the boys had left, and a light in the church had a short-circuit in it. The local fire chief was unable to determine the cause of the fire, although he concluded it originated near where the first group of boys had been. On appeal, the Supreme Court rejected a claim that the evidence

was insufficient because there were other possible causes of the fire: "The fallacy of defendant's argument is that in order for circumstantial evidence to be sufficient to sustain a finding in a civil case, such evidence need not rise to that degree of certainty which will exclude any and every other reasonable conclusion. It suffices that such evidence affords a basis for a reasonable inference by the court or jury of the occurrence of the fact in issue, although some other inference equally reasonable might be drawn therefrom. Causation, like any other fact question, may be shown by circumstantial evidence." *Id.,* 201 Kan. at 343–44, 440 P.2d 621 [citations omitted].

In another case, *Yount v. Deibert,* 282 Kan. 619, 147 P.3d 1065 (2006), a group of boys engaged in various "pyromanical activities" in a house before going out. They may have left one candle burning in a candle holder when they left. A fire later that night killed two boys in the house. A fire marshal testified he could not determine the exact cause of the fire. The lower court granted summary judgment to the defendant, finding no evidence that the fire was negligently caused by the boys who had earlier been lighting items in the house, as claimed by the plaintiff. The Supreme Court reversed, finding the triers of fact in such a case were permitted to draw upon their own experiences in determining causation. The Court acknowledged that a mere possibility of causation is not enough, and when the matter remains one of speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict. *Id.,* 282 Kan. at 628, 147 P.3d 1065. But the plaintiff is not required to prove the case beyond a reasonable doubt, and need not negate entirely the possibility that the defendant's conduct was not a cause. *Id.* "[I]t is enough to introduce evidence from which reasonable persons may conclude that it is more prob-

able that the event was caused by the defendant than that it was not." *Id.*

Like the foregoing cases, there is evidence here of a possible alternative cause of the fire that no fire expert can rule out. But a jury crediting the plaintiffs' evidence, and believing the testimony of Adam Pekarek, could reasonably exclude that cause and find that a defect in the blanket caused the fire. Viewed in a light most favorable to plaintiff, the circumstances would "justify an inference of probability as distinguished from mere possibility." *Mays,* 233 Kan. at 54, 661 P.2d 348. The defendant's motion for summary judgment on plaintiff's product liability claims will therefore be denied.

2. *Kansas Consumer Protection Act Claim.* Defendant argues that no evidence exists to support plaintiffs' claim under the KCPA. Plaintiffs' response fails to address this argument, and the factual basis for any such claim is not apparent. Accordingly, the court will grant defendant's motion for summary judgment as to any claims under the Kansas Consumer Protection Act.

 3. *Punitive Damages.* Defendant next contends there is no evidence to support a claim for punitive damages. It argues that it complied at all times with applicable safety standards, used the best technology available, and adequately warned about known dangers. Sunbeam says plaintiffs' allegations of willful or wanton conduct are based upon past technology and have no relevance to products with the Circuit 104 technology, such as the subject blanket.

 In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar

wrongs. *Cerretti v. Flint Hills Rural Electric Co-op. Ass'n,* 251 Kan. 347, 366, 837 P.2d 330 (1992). "An act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act." *Id.* Kansas law requires a plaintiff to prove by clear and convincing evidence that a defendant acted toward the plaintiff with willful or wanton conduct. See K.S.A. 60–3701.

Plaintiffs have cited evidence that the PTC technology used in blankets of this type presents certain fire risks, a fact well known to the defendant, and that prior safety circuits utilized by Sunbeam failed to adequately protect against those risks. The Circuit 104 more recently developed by Sunbeam, which was used in the Pekarek blanket, appears to have substantially reduced claims of failure of such products. Yet, plaintiffs have cited some evidence of at least two prior failures involving the Circuit 104, and have cited evidence that Sunbeam is aware the Circuit 104 will not protect against all known risks of the PTC cable. Although plaintiffs' response to this motion is somewhat heavy on rhetoric and short on facts (e.g., "Sunbeam is content to play a game of Russian Roulette with the property and lives of its consumers"), at this point, without having heard all the circumstances and the inferences that could arise from the evidence, the court cannot say that a claim for punitive damages is barred as a matter of law. The motion for summary judgment as to punitive damages is therefore denied.

■ 4. *Spoliation.* Finally, defendant argues it is entitled to summary judgment based on spoliation of evidence by the plaintiffs. Defendant says "[d]espite the fact that Plaintiffs and their insurance company knew within a couple of days after the fire that the electric blanket was being implicated as a possible cause of the fire, no one placed Sunbeam on notice of

the incident until the fire scene had been cleared and all of the evidence in the room of origin was removed." Doc. 87 at 32.

■ District courts have inherent authority to impose sanctions when a party destroys evidence that it knows or should know is relevant to potential litigation. "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Henning v. Union Pacific R. Co.,* 530 F.3d 1206, 1220 (10th Cir.2008). Even if the court assumes the plaintiffs should have known that litigation was likely when the fire scene was cleared, defendant has not shown prejudice from plaintiffs' actions so as to justify the drastic remedy of granting of summary judgment. Relevant evidence from the fire scene was preserved or documented, including the remains of the electric blanket, and defendant has not specified how it was prejudiced by the lack of notice. Defendant has not shown an entitlement to summary judgment based on its allegations of spoliation.

## VI. Conclusion.

Defendant's Motion in Limine to Exclude Expert Testimony of William Cronenwett (Doc. 82) is DENIED.

Defendant's Motion in Limine to Exclude Expert Testimony of Chris Komarek (Doc. 84) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to Mr. Komarek's opinions that the blanket was the probable cause of the fire. The motion is denied in all other respects.

Defendant's Motion in Limine to Exclude Expert Testimony of Reid Kress (Doc. 88) is DENIED as moot in view of plaintiffs' withdrawal of the expert designation for Dr. Kress.

Defendant Sunbeam's Motion for Summary Judgment (Doc. 86) is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to plaintiffs' claim under the Kansas Consumer Protection Act; such claim is hereby dismissed. The motion for summary judgment is denied in all other respects.